## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **FRED SUN GUICE JR.,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:14-CV-1850-KOB** |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On September 24, 2013, the claimant, Fred Sun Guice Jr., applied for disability insurance benefits under Title II and supplemental security income under Title XVI of the Social Security Act. (R. 84-85). The claimant initially alleged that he became disabled on January 1, 2004 because of post-traumatic stress disorder (PTSD), hypertension, dyslipidemia,[1] and drug and alcohol abuse. (R. 62). The Commissioner denied the claimant's applications, and the claimant filed a timely request for a hearing before an Administrative Law Judge. (R. 92, 97). At the April 14, 2014 hearing, the claimant voluntarily withdrew his application for disability insurance benefits, leaving only his claim for SSI benefits remaining, and amended his alleged disability onset date to September 24, 2013. (R. 35, 40-42).

On May 6, 2014, the ALJ issued a decision denying the claimant's applications finding

---

[1] Dyslipdemia is defined as a high level of cholesterol or fat in the blood.

that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R. 31). The Appeals Council denied the claimant's request for a review of the hearing decision on July 31, 2013. (R. 1). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court REVERSES and REMANDS the decision of the Commissioner.

## II. ISSUE PRESENTED

Whether the ALJ erred in finding no severe impairments at step two in the sequential evaluation process, specifically regarding the claimant's hypertension and PTSD.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if she applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker,* 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker,* 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take into account evidence that detracts from the evidence on which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

3

To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subtpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

"In sequential evaluation step two, the Commissioner determines whether a claimant has a 'severe' impairment or combination of impairments that causes more than a minimal limitation on a claimant's ability to function." *Davis v. Shalala*, 985 F.2d 528, 532 (11th Cir. 1993). At step two, the claimant has the burden to show that he has a severe impairment. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *see also* 20 C.F.R. §§ 404.1520, 416.920. "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild. An impairment is not severe only if the abnormality is so slight and its effect is so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *McDaniel*, 800 F.2d at 1031.

A disability rating by the Veteran's Administration (VA) regarding a claimant's disability status is not binding on the ALJ, but "should be considered and 'given great weight.'" *Boyette v. Comm'r of Soc. Sec.*, 605 F. App'x 777, 779 (11th Cir. 2015). The fact alone that the VA and Social Security Administration used different criteria to evaluate disability is not sufficient

justification for an ALJ to accord less than great weight to the claimant's VA disability rating. *Jones v. Colvin*, No. CV-114-046, 2015 WL 2127483, *3 (S.D. Ga. May 6, 2015); *Gibbon v. Comm'r of Soc. Sec.*, 725 F. Supp. 2d 1347, 1351 (M.D. Fla. 2010); *Hogard v. Sullivan*, 733 F. Supp. 1465 (M.D. Fla. 1990).  Although an ALJ does not specifically assign a VA disability determination "great weight," she may implicitly do so by relying on VA records in making her determinations.  *Kemp v. Astrue*, 308 F. App'x 423, 426 (11th Cir. 2009).

## V. FACTS

The claimant was fifty-seven years old on the date of the ALJ's decision. (R. 62). He earned a bachelor's degree in business education and has taken some graduate school courses. (R. 517). The claimant had past relevant work experience as a counselor and janitor, but had not engaged in substantial gainful activity since April 1, 2010. (R. 213, 230).  The claimant alleged disability, beginning September 24, 2013, based on PTSD, hypertension, dyslipidemia, and drug and alcohol abuse. (R. 26).

*Physical Impairments*

On January 25, 2011, Dr. Reginald Mason, a primary care physician at the VA Medical Center, examined the claimant for the first time. Dr. Mason noted that the claimant smokes a quarter of a pack of cigarettes per day and occasionally uses marijuana and cocaine. Dr. Mason diagnosed the claimant with moderately high blood pressure, with "intermittent abdominal discomfort" with nausea and vomiting that lasts one to two weeks at a time, but no chest pain. Dr. Mason ordered the claimant to have his blood pressure rechecked in one week's time.  (R. 496-98).

During Dr. Mason's recommended blood pressure check up on February 2, 2011, the

5

claimant had a normal blood pressure of 118/80. The claimant again had high blood pressure at 164/109 on February 22, 2011. Dr. Mason's nurse notified Dr. Mason of the claimant's current status. (R. 484, 491-92).

During March and April, 2011, the claimant's blood pressure remained elevated at 148/97 on March 1; 145/83 on March 23; and 162/104 on April 29. (R. 460, 471, 480).

At a follow-up with Dr. Mason on May 26, 2011, the claimant's blood pressure reading was high at 186/112. At that time, Dr. Mason diagnosed the claimant with hypertension and prescribed him lisinopril to lower his blood pressure. Furthermore, the claimant's labs showed elevated cholesterol levels, but Dr. Mason did not prescribe any medication or note this finding in his report.  (R. 450-51).

On May 31, 2011, the claimant had a blood pressure of 147/97, prompting Dr. Mason to increase the claimant's dosage of lisinopril. (R. 445).

The claimant attended a blood pressure check-up with Dr. Mason on November 10, 2011. Dr. Mason's nurse noted that, although his blood pressure was high, the claimant had not taken his blood pressure medication that day. (R. 428).

The claimant's blood pressure was again high at 151/97 on March 20, 2012. Dr. Mason took no further action at that time, other than to encourage the claimant to take his blood pressure medications. (R. 422-23).

Dr. Mason saw the claimant for a follow-up visit on April 4, 2012. The claimant's blood pressure was elevated at 128/80, but Dr. Mason did not change the claimant's medication regimen. In addition, the claimant complained of intermittent stomach pain. The claimant's labs also showed high potassium and calcium levels.  (R. 411-13).

6

Dr. Mason ordered an EKG, which the claimant underwent on May 7, 2012.  He had elevated blood pressure during the EKG examination, although testing showed no significant abnormalities.  On May 8, 2012, at his re-check appointment, the claimant's blood pressure was high at 150/88, and he complained of chest discomfort and headaches.  In addition to the lisinopril, Dr. Mason prescribed 12.5 mg of atenolol to lower his blood pressure. (R. 402-04).

The claimant had elevated calcium levels at a follow-up visit on June 9, 2012.   On August 1, 2012, his initial blood pressure reading was 209/117, but dropped to 180/110 after a manual re-check.  The claimant reported headaches, but Dr. Mason did not change the claimant's prescriptions or instructions at either visit. (R. 381, 387).

On March 27, 2013, the claimant underwent a CT scan of his chest at the VA Medical Clinic after being hit in the side with a baseball bat. Chief radiologist Kevin Smith noted that the examination showed moderate emphysema and bi-basilar scarring. Dr. Smith notified Dr. Mason of his findings, but Dr. Mason did not prescribe any treatment for the claimant's symptoms.  The claimant's blood pressure reading on this visit was high at 132/92.  (R. 276, 379).

Dr. Mason saw the claimant for a follow-up on April 30, 2013. The claimant had elevated blood pressure of 159/100, but did not complain of any chest pain or other problems. (R. 366-68).  Dr. Mason ordered a blood pressure monitoring device for the claimant because of concerns about changes in his blood pressure.

Subsequently, the claimant had elevated blood pressure of 147/90 on July 18, 2013. Dr. Mason noted that the claimant admitted to only taking half of one of his two blood pressure medications, possibly the lisinopril, and encouraged the claimant to take the medication as prescribed. (R. 358).

7

The claimant's blood pressure was elevated at 131/83 on August 21, 2013 and at 153/100 on September 24, 2013.  During the September 24th re-check, Dr. Mason increased the lisinopril to 20 mg tab daily to control his high blood pressure.  In addition, the claimant's labs showed high cholesterol levels on September 12, 2013. (R. 350, 353, 511-14).

*Mental Impairments*

Dr. Mason, the claimant's primary care physician, first diagnosed the claimant with PTSD and substance abuse during the claimant's initial visit on January 25, 2011.  Dr. Mason counseled the client to abstain from tobacco and drug use and referred him to a psychiatrist for further evaluation of his PTSD and depression. (R. 497-509).

Dr. Carin Eubanks, a psychologist with the VA Medical Clinic, saw the claimant on January 31, 2011, regarding his symptoms of depression. Dr. Eubanks noted that the claimant had experienced dysphoric mood swings, anxiety, and decreased appetite, leading to a diagnosis of depression. Her mental status examination "revealed that [the claimant] is experiencing significant psychological distress," but with no "gross cognitive confusion."  Furthermore, Dr. Eubanks opined that the claimant's daily use of alcohol and tobacco, weekly use of marijuana, and occasional use of cocaine amounted to substance abuse. Dr. Eubanks referred the claimant to psychotherapy. The claimant expressed that he did not want to take prescription anxiety or depression medication for his symptoms. (R. 492-96).

In February of 2011, the claimant saw Beverly Kyle, a social worker at the VA Medical Clinic, for psychotherapy. During this session, the claimant stated that he was threatened with sexual assault in 1974 during his brief time with the military, leading to a suicide attempt. Following the claimant's suicide attempt, he was honorably discharged from the Army. The

8

claimant expressed that he thought about this frequently, which led to him distrusting and hating "all men," including himself. The claimant additionally said that he tried not to think about the event because it made him irritable and distressed. Ms. Kyle determined that the claimant showed signs of PTSD with morbid depression and substance abuse. (R. 485-87).

The claimant saw Ms. Kyle again on March 1, 2011 for a follow-up. The claimant reported feeling worse after talking to Ms. Kyle the previous week because he thought more about what happened to him during his time in the military. The claimant further stated that he feels more confident when using drug and alcohol, despite family and friends telling him they would like to see him sober. The claimant's labs also tested positive for cocaine and marijuana during this visit. Additionally, the claimant stated that he tends to "walk away" from good jobs and helpful people in his life because of his changing moods. Ms. Kyle suggested the claimant attend Seeking Safety groups, which he agreed to do.

On March 2, 2011, Dr. Li Li, a psychiatrist at the VA Medical Clinic, met with the patient for an initial evaluation. Dr. Li affirmed the claimant's diagnoses of PTSD, depression, and substance abuse, but opined that the claimant's symptoms could be controlled by Ms. Kyle's plan for the claimant to attend therapy. Additionally, the claimant asked Dr. Li for medication to control his "craving" for alcohol. Dr. Li prescribed the claimant 40 mg Celexa for anxiety and 20 mg Doxepin for insomnia. (R. 476-78).

The claimant attended Seeking Safety group therapy on two occasions in March 2011. The reports stated that he was cooperative and attentive throughout the sessions. (R. 461-64).

On April 6, 2011, Ms. Kyle again saw the claimant for therapy, although the session lasted only ten minutes. The claimant stated that he was anxious about his mother, who was in

9

critical condition, and needed to get home. The claimant reported that he continued to use marijuana and cocaine, but had "cut back" and "voiced [a] desire to get help." Claimant reported that the Doxepin helped him sleep better, and that he "tolerated" the Celexa, but saw no improvement in his depression. (R. 461-64).

On May 4, 2011, the claimant saw Cathy Prellwitz, a licensed clinical social worker at the VA Medical Clinic, for examination of his PTSD and depression symptoms. Ms. Prellwitz noted that the claimant often left group therapy early after becoming tearful. She also stated that the claimant did not share his feelings with the group often. She advised that the claimant had "no visible signs of intoxication" and encouraged him to let his therapist know that he was having difficulty with "things going on that [he doesn't] want to talk about." (R. 455-57).

The claimant again saw Ms. Prellwitz on May 6, 2011. The claimant reported that he lost two family members in the recent tornado. He stated that he "was doing better when taking medications" before their deaths, but that he "ran off meds." Ms. Prellwitz noted that coping with these losses was "hard for [the claimant] emotionally." (R. 453-54).

The claimant attended his scheduled Seeking Safety Group on May 26, 2011, and participated openly. (R. 542-54). Ms. Kyle also saw the claimant on May 26, 2011, noting that the claimant was stressed about caring for his mother. The claimant admitted having a hard time dealing with his sisters who were "rude and abrasive" when caring for his mother. The claimant stated that he "had not been trying to stop drinking"; had "stayed away from cocaine"; but had been smoking marijuana "some" in the evenings. (R. 448-49).

The claimant attended the Seeking Safety Group meeting on June 1, 2011, but voiced no particular concerns about his mental state at that time. (R. 440-41).

10

Additionally, on June 15, 2011, the claimant followed up with Ms. Kyle. The claimant's mood was "down," and he voiced concerns about his family and his finances, after his unemployment benefits had been discontinued. The claimant continued to drink a large amount of alcohol daily and his labs were positive for cocaine and marijuana. (R. 439-40).

The claimant attended the Seeking Safety Group meetings on July 13, 2011 and July 20, 2011, but did not have any particular concerns at that time. (R. 433-45).

Ms. Kyle saw the claimant on July 21, 2011 for a follow-up visit. The claimant reported improvement with his emotional state because his mother was moved from hospice to home health care. He stated that he has reduced his consumption of alcohol, but remained ambivalent about quitting. Additionally, the claimant voiced interest in quitting marijuana and cocaine. Ms. Kyle described the claimant's speech as having a "distressed tone" and his "mood congurent." Her diagnostic impression continued to be PTSD with co morbid depression and substance abuse. (R. 432-33).

The claimant presented for an additional follow-up with Ms. Kyle on August 10, 2011, where the claimant stated that his situation was improving. In addition, the claimant had been taking his medications for anxiety, although he did so infrequently, and was drinking less. (R. 429-30).

On November 10, 2011, Dr. Li, a psychiatrist with the Veterans Administration Medical Clinic, again met with the claimant. Dr. Li noted that the claimant had not picked up his anxiety and sleep prescriptions since May. The claimant reported living "in the street" for a week while his family was in town and using more drugs than usual. However, he stated that he had "stopped all meds while abusing drugs," but wanted to resume his treatment, including help for

his addiction. (R. 425-27).

Dr. Li examined the claimant on March 20, 2012. The claimant indicated feeling stressed about caring for his mother and having a poor appetite. However, the claimant denied feeling depressed, despite having not refilled his anxiety and sleep medications since November 2011. Dr. Li discontinued his prescription for Celexa because the claimant was not taking the medication and noted "unsure of benefit [of Celexa] with ongoing substance abuse." (R. 418-20).

On May 8, 2012, Ms. Kyle again saw the claimant. The claimant admitted to continuing the use of alcohol, marijuana, and cocaine, but did not plan to quit because he gets the drugs for free from his friends. Furthermore, the claimant expressed that he had not felt any depression and was coping well with his mother's illness and taking care of her. (R. 400-02).

Dr. Phillip Mark, a psychologist with the VA Medical Clinic, completed a PTSD Disability Benefits Questionnaire form for the claimant on May 15, 2012. Dr. Mark's report noted the claimant's diagnosis of PTSD stemming from his time with the military and reported fear of sexual abuse from a member of his basic training group. Additionally, the report stated that the claimant's efforts to avoid thinking about a traumatic incident and avoiding activities or people related to that trauma stimulated his PTSD symptoms. Dr. Mark's report stated that the claimant reported feeling "upbeat most of the time," but occasionally having depressed mood, anxiety, suspiciousness, difficulty falling asleep, and irritability or outbursts of anger; having no other friends outside his family with which he spends time; and discontinuing his anxiety medications because "he felt they did not help and had negative side effects." (R. 391-96).

Dr. Mark found that the claimant's PTSD caused "occupational and social impairment

due to mild or transient symptoms which decrease work efficiency and ability to perform

occupational tasks, during periods of significant stress."  He reported that the claimant

"reexperiences" his traumatic event of the constant threat of being raped by the "recurrent and

distressing recollections of the event, including images, thoughts or perceptions"; intense

psychological distress at exposure to internal or external cues that symbolize or resemble an

aspect of the traumatic event"; and "physiological reactivity on exposure to internal or external

cues that symbolize or resemble an aspect of the traumatic event."  Dr. Marks indicated that the

claimant avoids the stimuli associated with his PTSD trauma with "efforts to avoid thoughts,

feelings or conversations associated with the trauma"; efforts to avoid activities, places or people

that arouse recollections of the trauma"; and efforts to detach or estrange from others.  (R. 391-

96).

Based on Dr. Mark's findings, the Veteran's Administration awarded the claimant a

disability rating of 30% for PTSD. (R. 307).

On January 4, 2014, Dr. Cynthia Neville, a licensed clinical psychologist, performed a

consultative "Mental Examination" of the claimant on behalf of the Social Security

Administration. Dr. Neville noted that the claimant stated he applied for social security benefits

because he was getting older and tired. The claimant told Dr. Neville that he had previously seen

a psychiatrist for depression, but discontinued seeing him because of side effects with the

medications he prescribed. The claimant additionally stated that he drinks and smokes cigarettes

daily, and used cocaine very recently, but that he has not used marijuana for some time. (R. 516).

Dr. Neville opined that the claimant suffers from persistent depressive disorder with mild

symptoms of depression, which she assessed may negatively affect his ability to remember and

follow through with instructions, to interact appropriately with coworkers and supervisors, and to handle work pressures to a mild degree. However, she also discussed that the claimant possessed the cognitive ability to understand work instructions, was of average intelligence, and had appropriate content of thoughts. Furthermore, Dr. Neville stated that the claimant's symptoms are unlikely to improve in the next year and that the claimant was unclear about his plan to refrain from substance abuse in the future. (R. 516-19).

On January 13, 2014, Dr. Robert Estock, a state agency psychiatric consultant, completed a  psychiatric review technique form ("PRTF") of the claimant at the request of the Social Security Administration. Dr. Estock opined that the claimant had "mild to moderate" psychological impairments including anxiety, affective disorders, and substance addiction. In addition, Dr. Estock found the claimant's statements about the intensity, persistence, and functionally limiting effects of the symptoms only partially credible. Dr. Estock, however, determined that the claimant's non-severe impairments could cause mild restriction of activities of daily living and mild difficultly maintaining social functioning, concentration, persistence, or pace. Furthermore, Dr. Estock noted that the claimant's impairments were complicated by his persistent use of drugs and alcohol. Dr. Estock specifically noted that he gave great weight to Dr. Neville's medical opinion in making his determination that the claimant did not have severe impairments. Finally, Dr. Estock summarized that the claimant did not have a severe mental impairment. (R.68-72).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for social security benefits, the claimant requested and received a hearing before an ALJ. (R. 99). At the hearing, the claimant

14

amended his onset date to September 24, 2013, and voluntarily dismissed his Title II application, leaving only an application for SSI benefits. (R. 40-41). The claimant testified that he had not worked since the alleged onset date of his diagnosed PTSD, emphysema, and depression. (R. 42).

At the time of the hearing, the claimant was fifty-seven years old and lived with his mother. He has a bachelor's degree in business education and attended some master's degree courses. (R. 44-45). He was in the Army in 1974, and he affirmed that he had received a 30 percent disability rating for PTSD and had received $395 per month from the VA beginning in 2011. The claimant also stated that he received food stamps in the amount of $182 per month. (R. 46-47).

The claimant attested that his psychological issues were preventing him form working. He could not work because he had anxiety, short patience, inability to make relationships with others, and would get depressed, although he noted that he was able to do the actual work required for the job. Furthermore, he stated that he last took medication for anxiety two years ago because it was too strong, leading to paranoia and nervousness. In addition, he stopped going to treatment sessions because he had to take care of his mother. (R. 48-49).

The claimant described that he left his job as a counselor because he lost interest and had stress from working with disabled people all the time. Subsequently the claimant stated he worked for a janitorial company for a year, but left after feeling like he was being picked on by his boss. The claimant detailed that he gets angry at people and "has words with them." At his janitor job, his boss assigned him to vacuum with a group of other individuals, but he believed she just followed him around. (R. 50-53).

The claimant explained that when he worked as a counselor, he stayed with and helped

15

care for people with physical and mental disabilities. He recalled that he decided not to take his patients to a company Christmas program and got into a fight with his boss. After that incident, he just "walked off" and did not return to his job. Furthermore, he stated that he regretted leaving afterwards, but could not change what had happened. The claimant affirmed that he had only worked as a counselor and a janitor in the past fifteen years. (R. 54-56).

Dr. Kessler, a vocational expert, testified that he had reviewed the claimant's file and had rendered opinions on what jobs the claimant could perform. Dr. Kessler stated that the claimant's past relevant work included office cleaner, classified as heavy, unskilled work with an SVP of 2; and counselor of disabled persons, classified as medium, skilled work with an SVP of 6. (R. 56-57).

The ALJ presented to Dr. Kessler a hypothetical involving an individual of the claimant's same age, education, and past work history with the following limitations: could perform the claimant past relevant work without exertional limitations; can understand, remember, and carry out simple work instructions, as well as detailed or complex work instructions; can occasionally interact with the general public, and frequently interact with coworkers and supervisors; and can sustain attention and concentration for at least two hour blocks of time with normal breaks during an eight hour day. Dr. Kessler responded that such a person could work as a counselor or office cleaner. Furthermore, Dr. Kessler opined that other relevant work exists in significant numbers in the national economy that such a person could perform, including assembly, packaging, and machine operating work. (R. 57-59).

The ALJ next presented a hypothetical to Dr. Kessler involving an individual of the claimant's same age, education, and past work history who can not interact with the general

16

public and can only occasionally interact with coworkers and supervisors.  Dr. Kessler replied

that such a person could work as a packager and machine operator, and that, in most positions

where the person works primarily in a setting not exposed to the general public or other people

on a continuous basis, the supervisor would only come around occasionally. Dr. Kessler,

however, opined that an individual who would have difficulty getting along with coworkers and

supervisors on an occasional basis and was limited to work that would be isolated with only

occasional supervision would be unable to work entirely. (R. 59-60).

### *The ALJ's Decision*

On May 6, 2014, the ALJ issued a decision finding that the claimant was not disabled

under the Social Security Act. (R. 20). First, the ALJ found that the claimant met the insured

status requirements of the Social Security Act through June 30, 2010. Second, the ALJ stated that

the claimant had not engaged in substantial gainful activity since the alleged onset date of

September 24, 2013. (R. 25).

Third, the ALJ found that the claimant had the following medically determinable

impairments: PTSD, hypertension, dyslipidemia, emphysema, and drug and alcohol abuse.

However, the ALJ found that none of these impairments were severe.  The ALJ opined that the

claimant did not have an impairment or combination of impairments that significantly limit his

ability to perform basic work-related activities for twelve consecutive months, and therefore, did

not have a severe impairment or combination of impairments to proceed past step two in the

sequential evaluation process.  (R. 26).

In making her determination, the ALJ considered all of the claimant's symptoms and the

extent to which those symptoms were consistent with the objective medical evidence and other

evidence. (R. 26).  First, the ALJ determined that the claimant did have impairments that could produce the claimant's symptoms. Second, however, the ALJ decided that the claimant's statements regarding his impairments and their impact on his ability to work were not fully credible. The ALJ found that none of the claimant's alleged physical impairments caused more than minimal work-related limitations. The ALJ found that the claimant's allegations of lower body cramps and blood clots were unsupported entirely by the medical evidence because of the absence of complaints or diagnosis. In addition, the ALJ opined that, although the claimant had borderline high cholesterol since 2011, the claimant had suffered no complications related to dyslipidemia, and took medications to lower his cholesterol. (R. 26-27).

The ALJ acknowledged that Dr. Mason had diagnosed the claimant with hypertension, but noted that medication controlled the claimant's hypertension, and the record showed no evidence of complications related to hypertension. Furthermore, the ALJ cited a stress test on May 7, 2012 that showed no indications of cardiovascular abnormality. Additionally, the ALJ found that a CT scan performed March 27, 2013, showed moderate emphysema, but the claimant had never complained of any breathing problems or taken any medications to treat breathing problems. (R. 27).

Subsequently, the ALJ noted that the claimant had stated that his psychological issues were the primary problem affecting his ability to work. The ALJ noted that the claimant had PTSD, but that the claimant stopped taking his medications to treat the condition after he experienced appetite and sleep loss. The ALJ further detailed that the claimant was first prescribed Celexa and Doxepin in March 2011, and the psychiatrist increased the dosage in April 2011. The ALJ pointed out that the medical records showed that the claimant had not refilled

18

these medications since May 2011, and that the claimant had engaged in increased substance abuse after ceasing to take his medications. The ALJ also noted that the claimant did not refill these prescriptions, despite doctors telling him to resume their use, and that the claimant had voiced improvement with his symptoms in March 2012, aside from the occasional stress involved with taking care of his mother, despite not taking his medication. (R. 27-28).

The ALJ acknowledged that the claimant was briefly in the military and had received a 30% VA disability rating for PTSD. However, the ALJ noted that in between the claimant's military service and his application for disability, he had obtained a bachelor's degree and worked for Allen University for over thirteen years. Furthermore, the ALJ stated that the claimant's mental health consultation on January 25, 2011 reflected that the claimant consumed two beers per day, used marijuana weekly and cocaine occasionally, and that he had no interest in discontinuing the use of drugs and alcohol. The ALJ also recognized that the claimant had been the primary care giver for his sickly mother since 2011. (R. 28).

The ALJ described that, in subsequent evaluations by the VA in March 2011, the claimant expressed a minor interest in quitting the use of drugs and alcohol, but continued their use. At that time, the claimant attended Seeking Safety Group therapy. In May 2012, the claimant told his psychologist that he had no desire to quit using drugs and alcohol, though he had cut back on his consumption of cocaine. The ALJ also noted that the claimant had stopped attending group therapy and had not seen a therapist regularly. Furthermore, the ALJ described that the claimant had increased his alcohol and marijuana consumption at that time. (R. 28).

After considering the medical evidence, the ALJ opined that the claimant's symptoms and limitations resulting from the claimant's PTSD diagnosis were "mild at best." The ALJ

concluded that the claimant had not received treatment nor taken medication for his PTSD symptoms since 2011, and had continually indicated that he was not interested in additional treatment for his symptoms. In addition, the ALJ opined that the claimant had not been employed for several years because he was serving as his mother's caretaker, not because of any disabling condition. The ALJ further found that the claimant had performed numerous tasks while caring for his mother requiring physical and mental abilities, including cleaning, shopping, food preparation, paying bills, and balancing bank accounts. (R. 28-29).

The ALJ gave little weight to the VA's Compensation and Pensions evaluation from May 2012, which gave the claimant a disability rating of 30% for PTSD. In the evaluation, the VA noted that the claimant's impairments were due to "mild or transient symptoms that decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or which were controlled with medication." The ALJ stated that she is not bound by the disability determination of another agency that has different standards for determining disability than the Social Security Administration. The ALJ affirmed that she must make a disability determination based on social security law alone. (R. 29-30).

The ALJ gave significant weight to Dr. Cynthia Neville's consultative examination of the claimant in January 2014. The ALJ noted that Dr. Neville did not find that the claimant had symptoms to support a diagnosis of PTSD, but that the claimant had mild depressive disorder and moderate cocaine and cannabis disorders. The ALJ stated that Dr. Neville opined that the claimant's ability to understand, remember, and follow through with instructions, his ability to interact appropriately with coworkers and supervisors, and handle work pressures might be limited to a mild degree. The ALJ opined that these medical opinions were consistent with the

record as a whole. (R. 29-30).

Finally, the ALJ gave significant weight to the PRTF of Dr. Robert Estock. Dr. Estock opined in his report that the claimant did not have a severe medically determinable impairment, but concluded that the claimant did have mild limitations in his activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace, with no extended episodes of decompensation. The ALJ reasoned that Dr. Estock's findings were consistent with the claimant's mental health records from the VA and the psychological evaluation of Dr. Neville. (R. 30).

In sum, the ALJ found that the claimant's minor physical and mental impairments, "considered singly and in combination," did not significantly limit the claimant's ability to perform basic work activities, and thus he had no severe impairments to proceed beyond step two and was not disabled.

## VI. DISCUSSION

The claimant argues that the ALJ erred in failing to find a severe impairment at step two of the sequential process, specifically regarding the claimant's hypertension and PTSD.  The court agrees and finds that substantial evidence does not support the ALJ's findings that the claimant's hypertension and PTSD were non-severe at step two.

Although the claimant has the burden of showing a severe impairment at step two, that step is a "threshold inquiry," and the ALJ should reject at this step only those "claims based on the most trivial impairments." *McDaniel*, 800 F.2d at 1031.  The ALJ should find an impairment non-severe "only if the abnormality is *so slight* and its effect is *so minimal* that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education,

21

or work experience."  *Id*. (emphasis added).

The ALJ erred when she found that the claimant had no severe impairments and failed to move beyond step two of the sequential analysis.  Regarding the claimant's hypertension, the ALJ found that it was a medically determinable impairment, but found that his high blood pressure "is reasonably well controlled with Lisinopril-hydrochlorthiazide, and there is no evidence of any complications arising from the claimant's hypertension."  (R. 27).  After a thorough review of the record, the court finds no substantial evidence to support the ALJ's finding that the claimant's hypertension was well-controlled with medication.  As discussed previously in the "Physical Impairments" section of the Memorandum Opinion, the claimant's blood pressure fluctuated constantly, but remained elevated at most re-checks from January 2011 through September 2013, even when the claimant took his prescribed medication.  The claimant's treating physician, Dr. Mason, as late as September 2013, increased the claimant's blood pressure medication to help control his blood pressure fluctuations.  The court is unclear from the record how the ALJ could find that the claimant's hypertension was "well-controlled" with medication.

Moreover, the record supports that the claimant reported headaches and chest pain associated with his high blood pressure.  The claimant also complained of severe abdominal pain, accompanied with nausea and vomiting, which can also be complications of high blood pressure. The court finds that substantial evidence does not support the ALJ's finding that his hypertension was well-controlled with medication and that he had *no* complications from his high blood pressure.  To the contrary, the medical record supports that the claimant's hypertension was more than a slight abnormality that could interfere with his ability to work, and the court finds that the

22

ALJ erred in failing to assess the claimant's impairments beyond step two.

The court also finds that substantial evidence does not support the ALJ's finding that the claimant's PTSD was so slight and so minimal to warrant a finding of non-severe.  An ALJ is required to accord "great weight" to a claimant's VA disability determination, despite the fact that the determination is not binding on the ALJ's decision.  *Boyette*, 605 F. App'x at 779.  An ALJ's reliance alone on the fact the VA and Social Security Administration use different criteria to evaluate disability does not constitute sufficient justification for an ALJ to accord less than great weight to the claimant's VA disability rating. *Jones v. Colvin*, No. CV-114-046, 2015 WL 2127483, *3 (S.D. Ga. May 6, 2015).

In this case, the ALJ expressly gave "little weight" to the VA's determination that the claimant was 30% disabled from PTSD. (R. 30). The ALJ explained her reasoning for giving the VA's opinion little weight:

> A decision by any nongovernmental agency or any other governmental agency about whether a claimant is disabled or blind is based on its own rules and is not the Social Security Administration's decisions about whether you are disabled or blind. The [ALJ] must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that the claimant is disabled or blind is not binding.

(R. 30).  Seemingly, the ALJ relies solely on the differences in the standards to support discounting the VA's 30% PTSD disability determination for the claimant.  This difference in standards does not constitute substantial evidence to support the ALJ giving "little weight" to the VA's 30% disability rating for the claimant's PTSD.

The ALJ did mention the claimant's records from the VA to support that the claimant stopped taking his anxiety medications and attending therapy.  However, Dr. Mark, the VA

psychologist who found that the claimant had a 30% disability rating for his PTSD, had already taken into account that the claimant had discontinued his anxiety medications because "he felt they did not help and had negative side effects." The claimant also testified at the hearing and reported to Dr. Neville, the consulting psychologist, that he stopped taking his medications because of the side effects, and the ALJ failed to address these claims.

Moreover, the claimant's ability to care for his mother does not negate that his PTSD could affect his ability to interact with other co-workers in a work setting and constitute a severe impairment in that regard. Dr. Mark, in making his disability rating determination for the claimant, accounted for the claimant's efforts to detach and estrange himself from others, but the ALJ did not address these PTSD symptoms. Dr. Estock, whose opinion on which the ALJ relies, indicated that the claimant had "mild to *moderate*" psychological impairments; a moderate impairment could certainly be one that is more than "so slight' or "so minimal," especially regarding whether the claimant's PTSD limited his ability to work closely with others in an employment setting. As such, the court finds that substantial evidence does not support the ALJ's failure to give the VA disability rating great weight and finding that his PTSD was a non-severe impairment.

The court finds that substantial evidence does not support the ALJ's finding that the claimant had no severe impairments at step two. On remand, the ALJ should proceed past step two and evaluate the claimant's severe and non-severe impairments using the remaining steps in the sequential process. Also, because the ALJ never addressed any issues past step two of the sequential process, she never fully assessed the effects of the claimant's drug and alcohol addictions and should do so on remand if appropriate.

## VII. CONCLUSION

For the reasons stated in this memorandum, the court finds that substantial evidence does not support the ALJ's findings that the claimant had no severe impairments at step two. The court will enter a separate Order in conformity with this Memorandum Opinion.

DONE and ORDERED this 11th day of March, 2016.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE